UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

STEPHEN LOUIS MITCHAM,

        Petitioner,

        v.

RON DAVIS, Acting Warden of California
State Prison at San Quentin,[1]

        Respondent.

Case No. 97-CV-03825-LHK

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL**

## INTRODUCTION

Petitioner was found guilty in 1984 of murder and attempted murder during a robbery. Petitioner is African American. His victims were Caucasian. During voir dire, the prosecutor struck 100 percent (eight of eight) of African Americans called to the jury box. At the time of Petitioner's trial, *People v. Wheeler*, 22 Cal. 3d 258 (1978), which held the use of peremptory challenges to strike venirepersons solely on the basis of race to be a violation of the California Constitution, had

---

[1] Ron Davis, acting warden of the California State Prison at San Quentin, is substituted as Respondent for his predecessor in that position pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1    been the law in California for six years.  *Batson v. Kentucky*, 476 U.S. 79 (1986), had not yet been

2    decided.  Petitioner's counsel did not object under *Wheeler* to the prosecutor's peremptory

3    challenges.  In a subclaim of claim D of his federal habeas petition, Petitioner argues that his trial

4    counsel was ineffective for failing to object to the prosecutor's use of peremptory challenges to

5    strike all African Americans called to the jury box.  For the reasons described below, the Court

6    GRANTS the petition for writ of habeas corpus as to claim D's subclaim of ineffective assistance of

7    counsel.  The Court dismisses Petitioner's remaining claims as moot.[2]

8                                           **BACKGROUND**

9            In 1984, a jury in Oakland, California, sentenced Petitioner to death following convictions

10   for first-degree murder, attempted murder, robbery, assault with a deadly weapon, and a special

11   circumstance finding that he committed the murder in the course of robbery.  Evidence at trial

12   established that on April 5, 1983, Petitioner robbed Ormond's Jewelry Store in Oakland.  During the

13   robbery, Petitioner murdered the proprietor, James Ormond, and attempted to murder Yvette

14   Williams, a store employee whom Petitioner shot in the cheek.  The evidence established that

15   Petitioner's co-defendant, Keith Hammond, drove the getaway car after the murder and robbery.

16           The California Supreme Court affirmed Petitioner's conviction and death sentence on

17   February 24, 1992.  *People v. Mitcham*, 1 Cal. 4th 1027 (1992).  The U.S. Supreme Court denied

18   certiorari on October 13, 1992.

19           Petitioner filed his first state habeas petition on January 7, 1992.  The California Supreme

20   Court denied this petition on the merits.  *In re Mitcham*, Cal. S. Ct. No. S024600.  Petitioner filed

21   his second state habeas petition on October 13, 1992.  The California Supreme Court denied this

22   petition on the merits and on procedural grounds on September 13, 1993.  *In re Mitcham*, Cal. S. Ct.

23   No. S029219.  Petitioner filed his third state habeas petition containing unexhausted claims on

24   February 9, 1998.  The California Supreme Court denied this petition on the merits and on

25   _____

26           [2] This Order supersedes ECF Doc. No. 408, which was filed in error.

27                                              2

1   procedural grounds on December 21, 1999.  *In re Mitcham*, Cal. S. Ct. No. S067887.

2           On February 11, 1998, Petitioner filed a habeas petition in federal court.  The case was

3   assigned to U.S. District Judge Vaughn R. Walker.  Petitioner later amended his petition to delete

4   unexhausted claims.  An amended petition containing newly exhausted claims was filed on February

5   4, 2000.  Respondent filed an answer on July 23, 2001.

6           The parties litigated procedural default issues in 2001.  On October 28, 2002, Judge Walker

7   issued an order finding certain claims and subclaims partially defaulted.  The parties subsequently

8   litigated several motions for summary judgment.  In an order filed on June 18, 2010, Judge Walker

9   granted summary judgment on numerous guilt phase claims in favor of Respondent, and requested

10  supplemental briefing in relation to claim D, Petitioner's claim that the prosecutor's use of

11  peremptory challenges to exclude African American jurors violated Petitioner's constitutional rights.

12  (ECF Doc. No. 348.)

13          On August 25, 2010, Judge Walker granted summary judgment in favor of Respondent on

14  claim D, with the exception of Petitioner's ineffective assistance of counsel subclaim.  (ECF Doc.

15  No. 351.)  Judge Walker found that "[b]ecause petitioner failed to object to the prosecutor's exercise

16  of peremptory challenges at trial, he has failed to preserve his *Batson* claim for review on federal

17  habeas."  *Id.* at 4.  Although Judge Walker precluded Petitioner from pursuing a *Batson* claim, Judge

18  Walker allowed Petitioner to proceed with his claim D subclaim that trial counsel's failure to object

19  to the prosecutor's improper peremptory challenges constituted ineffective assistance of counsel.  *Id.*

20          In a subsequent order, U.S. District Judge Jeffrey S. White, to whom this case was

21  transferred on September 29, 2011, ruled that *Batson* does not apply to Petitioner's ineffective

22  assistance of counsel subclaim.  (ECF Doc. No. 379 at 3.)  Because Petitioner was tried in 1984, and

23  *Batson* was not decided until 1986, Judge White concluded that "[e]valuating trial counsel's

24  performance based on caselaw that had not yet been decided at the time of trial would run counter to

25  *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]'s directive."  *Id.* at 2.  Although Judge White

26  precluded Petitioner from pursuing an ineffective assistance of counsel subclaim based on

27                                                    3

28  Case No. 97-CV-03825-LHK
    ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
    INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's trial counsel's failure to raise a *Batson* objection, Judge White allowed Petitioner to proceed with Petitioner's subclaim that trial counsel's failure to raise an analogous objection under *Wheeler* constituted ineffective assistance of counsel.  The case was transferred to the undersigned on January 4, 2012.  (ECF Doc. No. 386.)

Petitioner thereafter conducted an extensive investigation in relation to the ineffective assistance subclaim based on *Wheeler*, including a comprehensive survey of the racial composition of Petitioner's entire qualified venire.  That investigation consisted of personal interviews of the 117 qualified jurors or their next of kin, as well as obtaining Department of Motor Vehicle photographs and, in some instances, death certificates.  The parties' briefs are now ripe for decision.  (ECF Doc. Nos. 397, 403, and 407.)

## PARTIES' ALLEGATIONS

Petitioner alleges that his trial counsel's failure to object to the use of peremptory challenges by prosecutor Albert Meloling (now deceased) to exclude eight of eight African Americans called to the jury box constituted ineffective assistance of counsel.  Petitioner alleges that had trial counsel, Lincoln Mintz (now deceased), and second counsel, Harry Traback, filed a motion under *Wheeler* objecting to the prosecutor's peremptory challenges, the motion would have been granted, resulting in a new jury venire panel at trial, or a new trial on appeal.  Respondent refutes Petitioner's allegations.

## JURY SELECTION PROCEEDINGS

Petitioner's counsel, Mintz, was appointed lead trial counsel for Petitioner by the Alameda County Superior Court in April 1983.  In December 1983, shortly before the beginning of jury selection, Traback, a former prosecutor, was appointed as second counsel.  Traback worked on certain assigned tasks, but he did not make any strategic decisions in Petitioner's case.  (ECF Doc. No. 397-1, Ex. 6, Decl. of Harry Traback at 64.)  Petitioner's jointly tried co-defendant, Keith Hammond, was represented by Alameda County deputy public defenders Harvey Homel and Diane Bellas.  All four defense attorneys agreed to work together in selecting the jury.  Mintz, however,

4

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1  was given the authority to exercise all peremptory challenges.  (ECF Doc. No. 397-1, Ex. 10, Suppl.
2  Decl. of Diane Bellas at 103.)  Meloling was the Alameda County deputy district attorney who
3  prosecuted Petitioner and his co-defendant.

4          During voir dire, 265 prospective jurors were questioned.  Clerk's Transcript ("CT") 211-55.
5  Thirty-six of the 265 prospective jurors were African American.  (ECF Doc. No. 397, Ex. 1, Decl. of
6  Investigator Melody Ermachild at 4.)  Of the 265 venirepersons, ninety-nine were excluded for cause
7  and fifty-five were excluded by stipulation of counsel.  CT 211-55.  After exclusions for cause and
8  by stipulation, 117 qualified prospective jurors – all of whom were death qualified – remained.  Of
9  these 117, seventeen were African American.  (ECF Doc. No. 397-1, Ex. 1, Decl. of Investigator
10 Melody Ermachild at 4.)

11         To select the jury, twelve qualified prospective jurors were randomly selected and called to
12 the jury box.  The prosecution and defense then alternately used their peremptory challenges to
13 strike prospective jurors.  During this process, thirty-one prospective jurors were called to the jury
14 box.  Reporter's Transcript ("RT") 3968-74.  The prosecutor challenged eleven prospective jurors,
15 and defense counsel challenged eight.  Thirteen additional prospective jurors were called during the
16 selection of four alternate jurors.  Of these, the prosecutor challenged four prospective alternates,
17 while the defense challenged five.  RT 3975-78.

18         The prosecutor used his peremptory challenges to strike every African American called to
19 the jury box.  The prosecutor struck each of the five African Americans called during the selection
20 of Petitioner's jury, and each of the three African Americans called as prospective alternates.  In
21 sum, of the fifteen prospective jurors struck by the prosecutor, eight were African American:
22 Clarence Spiller, Aunita Jones, Abdulel Luqman, Willetta Combs, Patricia Fuller, Sharon Penn,
23 Beverly Frazier, and Charles Threets.  As a result, Petitioner had no members of his race among the
24 twelve jurors and four alternate jurors.  (ECF Doc. No. 397-1, Ex. 1, Decl. of Investigator Melody
25 Ermachild at 9.)  The empaneled jury consisted of eleven Caucasian jurors and one Hispanic-
26 surnamed juror.  *Id.*

27
28

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

During voir dire, the prosecutor and the four defense attorneys entered an agreement to shorten proceedings by providing each other the names of potential jurors that each side intended to challenge, and to then shorten or forgo questioning of these jurors.  (ECF Doc. No. 397-1, Ex. 8, Suppl. Decl. of Harvey Homel at 84-85.)  The prosecutor's list of prospective jurors whom he intended to strike included eighteen prospective jurors, eight of whom were African American. (ECF Doc. No. 397-1, Ex. 6, Decl. of Harry Traback at 67.)  The defense list consisted of five prospective jurors – four Caucasians and one Hispanic-surnamed juror.  The prosecutor struck four of the eight African American prospective jurors on his list, as well as four other African Americans who were not on the prosecutor's list.  Jury selection was completed before the four remaining African American prospective jurors on the prosecutor's strike list, Frank Beavers, Hubert Martin, Anthony Pigrum, and Prettiest Wylie, were called to the jury box.  The prosecutor thus struck every African American called to the jury box (eight of eight), and demonstrated to defense counsel an intent to strike twelve African American jurors (i.e., the eight African American jurors who were on the prosecutor's strike list, plus the four who were not on the list, but were called to the jury box and struck by the prosecutor).

16
17
18
19
20
21
22
23

The record makes clear that the prosecutor was keeping track of the race of the African American prospective jurors: he wrote "B" next to their names on the qualified jury list and gave them a "failing grade."  (ECF Doc. No. 397-2, Ex. 13, Alameda County Jury List.)  He did not keep track of the race of any other jurors.  The prosecutor's voir dire notes reveal his acceptable juror ratings (a "K" by itself, circled, or "K?") and unacceptable ratings (an "O" by itself, or "O?").  (ECF Doc. No. 397-2, Ex. 15, Deposition of Albert Meloling in *Hovey v. Calderon*, No. 89-01430-MHP, at 26.)  The prosecutor rated all seventeen of the qualified African American jurors with an unacceptable "O" next to their names, with the exception of prospective juror Theodore Carter, who

24
25
26
27
28

6

was never called to the jury box.[3]  Thus, in addition to the eight African Americans on the prosecutor's strike list and the four additional African American jurors who were not on the prosecutor's strike list but were struck by the prosecutor, there were four more African American prospective jurors whom the prosecutor identified with a "B" and deemed unacceptable: Frances Crockett, Cheryl Favroth, Nathaniel Fripp, and Keith Smith.  In total, then, the record shows the prosecutor intended to strike sixteen of the seventeen qualified African American jurors.

Additionally, the prosecutor's handwritten notes during voir dire of African American prospective juror Willetta Combs state that she is "Black" and that: "She has some feelings about death penalty – but could impose it in a given case.  I think she would be alright but she does have some reservations about death – Keep if necessary to avoid *Wheeler* – She would try to be fair." (ECF Doc. No. 397-2, Ex. 14 at 19.)

The prosecutor also struck Caucasian prospective jurors who evidenced a connection to African Americans.  The prosecutor challenged Alan Dundes, a Caucasian professor of folklore and anthropology at U.C. Berkeley, who stated that he had an interest in African American culture and had written a book on African American folklore.  RT 1727, 1733.  The prosecutor also struck Diane Weston, a Caucasian female, after questioning about her husband's employment suggested that he might be African American.  (ECF Doc. No. 397-2, Ex. 17, Decl. of Diane Weston.)  Indeed, the prosecutor's voir dire notes stated about Weston: "Think her husband is black."  (ECF Doc. No. 397-2, Ex. 14 at 20.)

The two defense teams also worked together to numerically rate the jurors who were not on the prosecutor's strike list.  The prospective jurors were rated on a scale of 1 to 5, with 5 being the best for the defense.  (ECF Doc. No. 397-1, Ex. 6 at 65-66.)  As described by co-defendant Hammond's counsel, Diane Bellas:

---

[3]  Although he later said he would consider mitigating factors, Carter initially responded, "Yes, I do," when asked by the prosecutor whether he felt that "every time . . . one person takes the life of another in a situation where the killing is intentional that their life should be taken."  RT 2769.

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1
2
3
4

Mr. Homel and I worked together with Mr. Mintz and Mr. Traback to rate and select the jury.  We used a numerical ratings system and collectively rated the jurors.  My recall is that the rating was 1 to 5, with 5 being the best rating for the defense.  A score of 0 or 1 would indicate a juror most predisposed to conviction and/or the penalty of death and a score of 3 and above would signify an acceptable or good juror for the defense.  I believe that in addition to the numerical score, a plus ("+") signified that the juror had strong convictions, attitudes or leadership potential and a minus ("-") signified that the juror had weaker convictions, attitudes or leadership potential.

5

(ECF Doc. No. 397-1, Ex. 10, Suppl. Decl. of Diane Bellas at 103.)

6

7

8

9

10

11

12

The defense highly rated four African Americans who were not on the prosecutor's strike list: Clarence Spiller (3½ +-*), Aunita Jones (5+-*), Abdulel Luqman (4*), and Willetta Combs (4+-). *Id.* at 105.[4]  These four individuals highly rated by the defense were eventually called to the jury box.  The prosecutor struck all of them.  Petitioner's trial counsel did not object to these peremptory challenges even though he had rated them as desirable jurors.  Furthermore, the Court notes that although voir dire proceedings lasted more than three months, the parties' exercise of peremptory challenges lasted less than half an hour.  RT 3970-78.

13

14

15

The prosecutor did not submit a declaration setting forth his justifications for striking African American jurors.  Similarly, Petitioner's lead trial counsel did not submit a declaration explaining his reasons for not raising a *Wheeler* objection.

16

**PETITIONER'S LEAD TRIAL COUNSEL'S DISBARMENT**

17

18

19

20

21

22

23

The disciplinary history of Petitioner's trial counsel began in 1995 with a private reproval for abandoning a client and failing to participate in the State Bar's disciplinary investigation.  (ECF Doc. No. 397-2, Ex. 12 at 9.)  In 1997, the State Bar suspended him for ninety days, stayed the suspension, and placed him on two years' probation for failing to comply with the conditions of his private reproval.  *Id.* at 9-10.  In 1999, the State Bar suspended him for two years, stayed the suspension, and placed him on three years' probation with a nine-month actual suspension for failing to communicate with two clients, to comply with his probationary terms, and to cooperate with eight

24

25

26

---

[4] The significance of the star symbol ("*") used by the defense team in the ratings is not apparent from the record, and Homel could not recall its significance. (ECF Doc. No. 397, Ex. 8, Suppl. Decl. of Harvey Homel at 84.)

27

28

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

1  State Bar disciplinary investigations. *Id.* He was ultimately disbarred in September 2000 as a result

2  of his misconduct, including professional wrongdoing dating back to 1968. *Id.* at 9.

3  **DISCUSSION**

4  **A.  Procedural Default**

5  As a threshold matter, Respondent asserts that Petitioner's subclaim is procedurally defaulted

6  because the California Supreme Court rejected it on the procedural ground that it could have been,

7  but was not, raised on direct appeal, a procedural bar established in *In re Dixon*, 41 Cal. 2d 756

8  (1953).  *See* Lodged Ex. FF.  The *Dixon* bar, according to Respondent, forecloses federal review of

9  Petitioner's subclaim.  The Court notes, however, that in a motion seeking dismissal of defaulted

10  claims filed in 2001, Respondent acknowledged that a *Dixon* default does not bar federal habeas

11  review of Petitioner's claims.  (ECF Doc. No. 227 at 5.)

12  Respondent's 2001 position is the correct one.  Under the doctrine of procedural default,

13  federal courts will not review "a question of federal law decided by a state court if the decision of

14  that court rests on a state law ground that is independent of the federal question and adequate to

15  support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  "For a state procedural

16  rule to be 'independent,' the state law basis for the decision must not be interwoven with federal

17  law." *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (citing *Michigan v. Long*, 463 U.S.

18  1032, 1040-41 (1983)).  A state law ground is interwoven with federal law in those cases where

19  application of the state procedural rule requires the state court to resolve a question of federal law.

20  *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (citing *Ake v. Oklahoma*, 470 U.S. 68, 75

21  (1985)).  Independence is measured at the time when the default is announced by the state court. *See*

22  *Vaughn v. Adams*, 116 F. App'x 827, 828 (9th Cir. 2004) (looking to the date the "habeas petition

23  was denied by the California Supreme Court" in determining whether a *Dixon* default was "an

24  independent procedural bar"); *Jones v. Ayers*, No. CIVS972167MCECMK, 2008 WL 906302, at *27

25  (E.D. Cal. Mar. 31, 2008) (explaining that "the independence of the *Dixon* default is determined as

26  of 2003, when it was imposed" by the state court in that case).

27

28

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1   For a state procedural rule to be "adequate," it must be clear, well-established, and

2   consistently applied. *Calderon v. U.S. Dist. Ct. (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996). The

3   issue of whether a state procedural rule is adequate to foreclose federal review is itself a federal

4   question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Douglas v. Alabama*, 380 U.S. 415, 422

5   (1965)). The adequacy of a state procedural rule must be assessed as of the time when the petitioner

6   committed the default. *See Zichko v. Idaho*, 247 F.3d 1015, 1021 (9th Cir. 2001) (stating that "a

7   state rule must be clear, consistently applied, and well-established at the time of petitioner's

8   purported default" for purposes of "the adequacy prong"); *see also Fields v. Calderon*, 125 F.3d

9   757, 760-61 (9th Cir. 1997) ("With respect to the *Dixon* rule, we have held that a relevant point of

10  reference for assessing [adequacy] is the time at which the petitioner had an opportunity to raise the

11  claims on direct appeal." (internal quotation marks omitted)).

12   In 1993, the date when the state court found Petitioner's subclaim procedurally barred, the

13  California Supreme Court's application of *Dixon* was not independent of federal law. *See Park*, 202

14  F.3d at 1152-53. In *Park*, the Ninth Circuit made clear that "prior to 1998," when *In re Robbins*, 18

15  Cal. 4th 770 (1998), was decided, "the California Supreme Court necessarily made an antecedent

16  ruling on federal law before applying the *Dixon* bar to any federal constitutional claims raised" on

17  state habeas. *Park*, 202 F.3d at 1152-53. In other words, "before *Robbins*, the *Dixon* rule was

18  interwoven with, and not independent from, federal law." *Bennett v. Mueller*, 322 F.3d 573, 582

19  (9th Cir. 2003) (internal quotation marks omitted). The California Supreme Court's application of

20  *Dixon* in the instant case, which occurred five years before *Robbins*, was therefore not independent

21  of federal law.

22   Respondent's citations to the contrary are inapposite because they all concerned post-

23  *Robbins* state court applications of the *Dixon* rule. *See Flores v. Roe*, No. F 02 5296 WMW HC,

24  2005 WL 1406086, at *11 (E.D. Cal. June 14, 2005) (*Dixon* default "occurred in 1999, making it a

25  post-*Robbins* default"), *aff'd*, 228 F. App'x 690, 691 (9th Cir. 2007); *see also Roevekamp v.

26  Choates*, No. CV 12-3845-CAS CW, 2013 WL 2456615, at *1-2 (C.D. Cal. June 5, 2013)

27                                                     10

1  (California Supreme Court's application of *Dixon*, which occurred on March 28, 2012, was

2  "post-*Robbins*"); *Roberts v. Uribe*, No. 11CV2665-WQH BLM, 2013 WL 950703, at *2-4 (S.D.

3  Cal. Feb. 6, 2013) (California Supreme Court's application of *Dixon*, which occurred on February 1,

4  2012, was post-*Robbins*); *Lee v. Mitchell*, No. CV 01-10751-PA PLA, 2012 WL 2194471, at *19-20

5  (C.D. Cal. May 1, 2012) (*Dixon* default was "post-*Robbins*"); *Cantrell v. Evans*, No. 2:07-CV-1440-

6  MMM, 2010 WL 1170063, at *1, *13-14 (E.D. Cal. Mar. 24, 2010) (state court application of

7  *Dixon* occurred no earlier than September 25, 2006, when the Shasta County Superior Court

8  "invoked the procedural bar").

9      Additionally, at the time of Petitioner's direct appeal in 1988, the *Dixon* rule was not

10  adequate.  This is so because, as the Ninth Circuit has held, *Dixon* defaults occurring before the

11  California Supreme Court's 1993 decisions in *In re Harris*, 5 Cal. 4th (1993), and *In re Clark*, 5 Cal.

12  4th 750 (1993), are "not an adequate state ground to bar federal habeas review." *Fields*, 125 F.3d at

13  763; *see also La Crosse*, 244 F.3d at 705 ("We have previously held that, at least prior to 1993,

14  neither California's *Dixon* rule nor its untimeliness rule was an adequate and independent state law

15  ground that could bar federal review.").  Respondent fails to cite any controlling authority to the

16  contrary.  What authority Respondent does cite only supports the Court's conclusion.  *See, e.g.*,

17  *Roevekamp*, 2013 WL 2456615, at *3 (explaining that the Ninth Circuit has found "the [*Dixon*] rule

18  to be inadequate at a time prior to the California Supreme Court's 1993 decision in *In re Harris*").

19      For the aforementioned reasons, Petitioner's ineffective assistance of counsel subclaim is not

20  procedurally defaulted.

21  **B.  Standard of Review**

22      Habeas petitions filed after April 24, 1996, such as Petitioner's, are governed by the Anti-

23  Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Mann v. Ryan*, 774 F.3d 1203,

24  1209 (9th Cir. 2014).  However, because the state court denied relief on procedural grounds and did

25  not reach the merits of Petitioner's ineffective assistance of counsel subclaim, this Court's review of

26  that subclaim is de novo, rather than subject to AEDPA's deferential standard that applies to "any

27  11

28  Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1   claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see*

2   *James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013) ("Where a state court does not reach the merits of

3   a federal claim, but instead relies on a procedural bar later held inadequate to foreclose federal

4   habeas review, we review de novo." (internal quotation marks omitted)), *cert. denied*, 134 S. Ct.

5   2697 (2014); *Scott v. Ryan*, 686 F.3d 1130, 1133 (9th Cir. 2013) (per curiam) (applying "*de novo*"

6   review, rather than AEDPA deference under § 2254(d), "because, although the claims were

7   presented to the state postconviction court, that court dismissed the claims on purely procedural

8   grounds"); *see also Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005) (applying de novo

9   standard of review to a First Amendment habeas claim that was denied solely on procedural grounds

10  by state court); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (de novo review, rather than

11  AEDPA's deferential standard, applies to a claim that was not adjudicated on the merits in state

12  court); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003) (AEDPA applies to petition but not to

13  petitioner's due process claim because state court did not reach its merits).

14      AEDPA nonetheless governs any factual determinations made by the state court, which are

15  "presumed to be correct" and can only be rebutted "by clear and convincing evidence." 28 U.S.C.

16  § 2254(e)(1); *see Khalifa v. Cash*, 594 F. App'x 339, 341 (9th Cir. 2014) ("[E]ven reviewing

17  [petitioner's] constitutional claim de novo, AEDPA still mandates that factual determinations by the

18  state court are presumed correct and can be rebutted only by clear and convincing evidence"

19  (internal quotation marks omitted)); *Lewis*, 391 F.3d at 996 (reviewing "de novo whether [petitioner]

20  waived his right to conflict free counsel, while deferring to any factual findings made by the state

21  court under 28 U.S.C. § 2254(e)(1)").

22      **C.  Ineffective Assistance of Counsel**

23      A claim of ineffective assistance of counsel is cognizable as a denial of the Sixth

24  Amendment right to counsel, which guarantees not only assistance, but effective assistance, of

25  counsel. *Strickland*, 466 U.S. at 686. The benchmark for judging any claim of ineffectiveness must

26  be whether counsel's conduct so undermined the proper functioning of the adversarial process that

27  12

28  Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1    the trial cannot be relied upon as having produced a just result. *Id.*

2            In order to prevail on an ineffective assistance of counsel claim, a petitioner must first show

3    that counsel's performance was deficient.  This requires showing that counsel made errors so serious

4    that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687.

5    A petitioner must show that counsel's representation fell below an objective standard of

6    reasonableness. *Id.* at 688.  The relevant inquiry is not what defense counsel could have done, but

7    rather whether the choices made by defense counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d

8    1170, 1173 (9th Cir. 1998).  Counsel's performance must be evaluated "'as of the time of counsel's

9    conduct.'" *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 690).

10           Second, a petitioner must show that counsel's errors were so serious as to deprive the

11   defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 688.  The defendant

12   must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

13   result of the proceeding would have been different. *Id.* at 694.  A reasonable probability is a

14   probability sufficient to undermine confidence in the outcome. *Id.*

15                    **1. *Wheeler* Standard**

16           Petitioner's claim of ineffective assistance of counsel is based on his trial counsel's failure to

17   object to a *Wheeler* violation.  In *Wheeler*, the California Supreme Court held that "the use of

18   peremptory challenges to remove prospective jurors on the sole ground of group bias violates the

19   right to trial by a jury drawn from a representative cross-section of the community under article I,

20   section 16, of the California Constitution." 22 Cal. 3d at 276-77.  The court's decision was also

21   rooted in the impartial jury guarantee of the Sixth Amendment of the U.S. Constitution. *Id*. at 272.

22           The first step in a *Wheeler* objection is to show a prima facie case of unlawful

23   discrimination.  A prima facie case has three elements:

24           First . . . [the party] should make as complete a record of the circumstances as is feasible.
             Second, he must establish that the persons excluded are members of a cognizable group
25           within the meaning of the cross-section rule.  Third, from all the circumstances of the
             case he must show a *strong likelihood* that such persons are being challenged because
26           of their group association rather than because of any specific bias.

27                                                   13
28

1    *Id*. at 280 (emphasis added).[5]

2        If a court finds that a prima facie case has been made, the court proceeds to the second step.

3    At step two, the burden shifts to the prosecution to show that the peremptory challenges in question

4    were not predicated on group bias alone.  The prosecutor may support his showing "by reference to

5    the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the

6    course of this same voir dire he also challenged similarly situated members of the majority group on

7    identical or comparable grounds."  *Id*. at 282.  "If the court finds that the burden of justification is

8    not sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is

9    rebutted."  *Id*. (emphasis added).

10        The remedy for a successful *Wheeler* motion is that "a different venire shall be drawn and the

11   jury selection process may begin anew."  *Id*.  If a *Wheeler* violation is found on appeal, the error is

12   deemed prejudicial per se: "The right to a fair trial and impartial jury is one of the most sacred and

13   important guaranties of the Constitution.  Where it has been infringed, no inquiry as to the

14   sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be

15   set aside."  *Wheeler*, 22 Cal. 3d at 283 (citing *People v. Riggins*, 159 Cal. 113, 120 (1910)).

16        Importantly, since the Court is evaluating the likelihood of success of Petitioner's

17   hypothetical *Wheeler* objection in the context of an ineffective assistance claim, Petitioner has the

18   burden of showing under *Strickland* (1) that counsel's failure to raise such an objection constituted

19

20 _____

21        [5] *Wheeler* has since been overruled in one respect.  In *Johnson v. California*, 545 U.S. 162,
     170 (2005), the U.S. Supreme Court held that the standard of proof required by *Wheeler*, "a strong
     likelihood," was too rigorous.  Instead, the U.S. Supreme Court concluded that the U.S. Constitution
22   only requires "evidence sufficient to permit the trial judge to draw an inference that discrimination
     has occurred."  *Id*.; *see also People v. Sattiewhite*, 59 Cal. 4th 446, 470 (2014) (recognizing that
23   *Johnson* overruled *Wheeler*'s "strong likelihood" standard).  Nevertheless, the Court here still
     evaluates the *Wheeler* violation under the "strong likelihood" standard because the Court must
24   consider Petitioner's ineffective assistance claim under the law the trial court would have applied
     between December 1983 and May 1984 had trial counsel raised an objection under *Wheeler*.
25   *Carrera v. Ayers*, 699 F.3d 1104, 1110 (9th Cir. 2012) (en banc) (applying "*Wheeler*'s 'strong
     likelihood' standard, rather than *Batson*'s 'raise an inference' standard," because that is the standard
26   the California court would have applied during the relevant time period).

27                                        14
     Case No. 97-CV-03825-LHK
28   ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1    deficient performance, and (2) a reasonable probability that such an objection would have been

2    successful. *See Carrera*, 699 F.3d at 1108 ("Because we are evaluating the likelihood of success of

3    Carrera's hypothetical *Wheeler* objection in the context of an ineffective assistance claim, he has the

4    burden to show under *Strickland* a reasonable probability he would have prevailed on a *Wheeler*

5    claim.").  For the reasons that follow, the Court concludes that Petitioner has carried his burden.

6                          **2.  Deficient Performance**

7            Petitioner's trial counsel's performance must be evaluated based on the law and prevailing

8    legal standards as they existed at the time of Petitioner's trial in 1984.  *Strickland*, 466 U.S. at 690.

9    The relevant question is whether in California in 1984, Petitioner's trial counsel's representation

10   "fell below an objective standard of reasonableness" when he failed to make a *Wheeler* motion to

11   discharge the venire because of the prosecutor's group-based peremptory challenges.  *Id.* at 688.

12   Petitioner must overcome the strong presumption that under the circumstances, the challenged action

13   "might be considered sound trial strategy."  *Id*. at 689.  That said, courts have found counsel's

14   failure to object to racial discrimination during jury selection to be deficient performance under

15   *Strickland*.  *See, e.g.*, *Doe v. Ayers*, 782 F.3d 425, 432 (9th Cir. 2015) (trial counsel's failure to raise

16   *Wheeler* objection to prosecutor's exercise of peremptory challenges "constituted deficient

17   performance" where two of four African Americans were struck and one African American was

18   empaneled); *Eagle v. Linahan*, 279 F.3d 926, 938-43 (11th Cir. 2001) (petitioner's appellate counsel

19   rendered ineffective assistance in not raising *Batson* claim on appeal); *Hollis v. Davis*, 941 F.2d

20   1471, 1476-79 (11th Cir. 1991) (petitioner's counsel's failure to object to systemic exclusion of

21   African Americans from jury service constituted ineffective assistance establishing cause to

22   overcome procedural default); *see also Drain v. Woods*, 595 F. App'x 558, 582 (6th Cir. 2014)

23   ("[D]efense counsel's failure to object to the manner in which the trial court dealt with the *Batson*

24   violation did constitute deficient counsel.").

25           At the time of Petitioner's trial, the prevailing standard of care for attorneys appointed to

26   represent criminal defendants at trial included the duty to engage in the jury selection process with

27                                        15

28   ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1    the goal of obtaining a fair and impartial jury for their client.  In California, a criminal defendant's

2    right to trial by a representative cross-section of the community had been recognized since at least

3    the 1950s.  *See People v. White*, 43 Cal. 2d 740, 754 (1954) ("The American system requires an

4    impartial jury drawn from a cross-section of the entire community and recognition must be given to

5    the fact that eligible jurors are to be found in every stratum of society.").

6           More specifically, in 1978, six years before Petitioner's trial, the California Supreme Court

7    had held that racial discrimination was prohibited in jury selection.  *Wheeler*, 22 Cal. 3d at 761-62.

8    Decisions of the California Supreme Court from 1978 to 1984 reversing lower court judgments on

9    *Wheeler* grounds "make clear that defense attorneys were making '*Wheeler* motions' under similar

10   circumstances at that time."  *Williams v. Woodford*, 396 F.3d 1059, 1071 (9th Cir. 2005)

11   (Rawlinson, J., joined by Pregerson, Reinhardt, Thomas, Wardlaw, W. Fletcher, Fisher, Paez, &

12   Berzon, JJ., dissenting from denial of rehearing en banc).  Those decisions included, for example,

13   *People v. Hall*, 35 Cal. 3d 161, 170-71 (1983) (reversing judgment on *Wheeler* grounds), *People v.

14   Allen*, 23 Cal. 3d 286, 295 (1979) (same), and *People v. Johnson*, 22 Cal. 3d 296, 300 (1978) (same).

15   Indeed, James Thomson, Petitioner's expert regarding the standard of practice applicable to criminal

16   defense attorneys, opines:

17          During the nearly eight years from the date of the *Wheeler* decision on September 25,
            1978, to the date of the United States Supreme Court's decision in *Batson v. Kentucky*,
18          476 U.S. 79, on April 30, 1986, the regular practice of defense counsel in California was
            to object to improper prosecutorial jury challenges under *Wheeler*.  By 1984, the time
19          of [Petitioner's] trial, criminal defense counsel had been trained to make *Wheeler*
            motions for well over five years.

20          In sum, the standard of care applicable to counsel in capital cases during 1983-84, the
21          period of trial counsel's representation of [Petitioner], required counsel to be alert to a
            prosecutor's misuse of peremptory challenges, and to protect a defendant's right to a fair
22          and impartial jury from a representative cross-section of the community by objecting and
            making a sufficient record when counsel suspects that the prosecutor is excluding
23          prospective jurors on the impermissible basis of race.

24   (ECF Doc. No. 397-1, Ex. 5, Decl. of James Thomson at 36.)

25          In failing to object to the prosecution's exercise of peremptory challenges, defense counsel

26   ignored ample evidence of a prima facie case of racial discrimination under *Wheeler*.  As the

27                                                    16

     Case No. 97-CV-03825-LHK
28   ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

California Supreme Court explained, evidence relevant to the establishment of a *Wheeler* violation includes a showing that: (1) the prosecutor has struck most or all of the members of an identified group from the venire, or has used a disproportionate amount of his peremptory challenges against that group; (2) the prospective jurors in question have only their group identification in common, and in all other respects are as heterogeneous as the community as a whole (e.g., "in a case of alleged exclusion on the ground of race it may be significant if the persons challenged, although black, include both men and women and are of a variety of ages, occupations, and social or economic conditions"); (3) the prosecutor fails to engage the prospective jurors in more than desultory voir dire, or fails to ask them any questions at all; and (4) the defendant is a member of the excluded group, and if in addition, the alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.  *Wheeler*, 22 Cal. 3d at 280-81.

The jury selection in Petitioner's case bore all of these indicia.  Inexplicably, defense counsel failed to raise a *Wheeler* objection despite being faced with the following facts:

- The prosecutor struck every single African American called to the jury box (Combs, Jones, Luqman, Spiller, Penn, Fuller, Threets, and Frazier), and he used a disproportionate number of peremptory challenges against them.  Specifically, he struck 100 percent of the African American prospective jurors (eight of eight) and 53 percent of his peremptory challenges (eight of fifteen) were directed against African Americans.  This was disproportionately higher than the percentage of African Americans within the qualified venire (14.5 percent).

- In sharing his strike list, the prosecutor gave the defense advance notice of the fact that he intended to exclude eight African American venirepersons (Penn, Fuller, Threets, Frazier, Beavers, Martin, Pigrum, and Wylie) if they were called to the jury box.  The prosecutor ultimately struck four African Americans who were not on the prosecutor's strike list (Combs, Jones, Luqman, and Spiller), demonstrating to

17

defense counsel an intent to strike twelve African American prospective jurors. The latter four jurors were all highly rated by the defense.[6]

- The prospective African American jurors had only their group identification in common, and in all other respects, were as heterogeneous as the community as a whole. The eight African American jurors excluded by the prosecutor differed in age, gender, employment, and social status. Of the eight, three were men, five were women, and their occupations and ages all varied: Willetta Combs (female in late 40s, postal service employee) RT 279-99; Beverly Frazier (female in early 40s, AT&T employee) RT 3794-809; Patricia Fuller (female in late 20s, social worker) RT 2008-20; Aunita Jones (female in late 30s, secretary at Equitable Life) RT 719-37; Abdulel Luqman (male, age unknown, manufacturing representative for Electronic Research Co., B.A. in engineering) RT 850-82; Sharon Penn (female in early 30s, drug counselor) RT 1530-37; Clarence Spiller (male in late 50s, truck driver) RT 1239-61; and Charles Threets (male in early 40s, metal polisher) RT 3534-43.

- Petitioner and his co-defendant were African American, the same race as the excluded jurors, and both victims were Caucasian, the same race as at least 11 of the 12 jurors who ultimately served on the jury. The final member of the jury was Hispanic-surnamed. No member of Petitioner's jury was African American.

- The prosecutor struck Caucasian prospective jurors such as Alan Dundes (college professor who had written a book on African American folklore) and Diane Weston (questioning suggested her husband may have been African American) who

---

[6] Although defense counsel would not have had access to the prosecutor's notes, the prosecutor identified with a "B" and rated unacceptable four additional African American venirepersons (Crockett, Favroth, Fripp, and Smith) who were not on the prosecutor's strike list and who were not called to the jury box. Thus, the evidence shows that the prosecutor intended to strike a grand total of sixteen of the seventeen qualified African American jurors. The prosecutor's notes also reveal that he kept track of the race of only African Americans.

18

evidenced potential sympathy for African Americans.[7]

●      As will be detailed further in Section 3, *infra*, the voir dire of three African American jurors who were struck, Combs, Luqman, and Threets, did not reveal evidence of "specific bias."  *Wheeler*, 22 Cal. 3d at 280.  Absent their race, these jurors should have been desirable to the prosecution.  RT 296 (Combs's daughter had a pending job application with sheriff's department); RT 875 (Luqman's brother was a police officer, his sister was a correctional officer, and another brother was a youth counselor); RT 3540 (Threets had two brothers who were deputy sheriffs in San Francisco).

●      As will be detailed further in Section 3, *infra*, the prosecutor did not strike eight Caucasian jurors and one Hispanic-surnamed juror who were called to the jury box and who preferred life without parole or equivocated on the death penalty: four served on Petitioner's jury (Klenk, Corrales, Garvin, and Charron); two served as alternates on Petitioner's jury (Goodwill and Moore); and two were struck by the defense (Bailey and Attwood).

●      As will be detailed further in Section 3, *infra*, the prosecutor did not engage in meaningful voir dire of the African American prospective jurors who appeared on his strike list.  *See, e.g.*, voir dire of jurors Frazier, RT 3794-809; Fuller, RT 2008-20; Penn, RT 1530-37; Threets, RT 3542-43.  As a result, the prosecutor failed to engage a number of the African American prospective jurors in more than desultory voir dire.

In light of the foregoing, the Court is convinced that defense counsel ignored significant evidence establishing a prima facie *Wheeler* violation.  Indeed, the facts of Petitioner's case are quite similar to those in *Wheeler*.  There, the prosecution used seven peremptory challenges to excuse all African American prospective jurors called to the jury box in a case where two African American

---

[7] With respect to Weston, the prosecutor wrote in his notes: "Think her husband is black." (ECF Doc. No. 397-2, Ex. 14 at 20.)

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1   defendants were accused of murdering a Caucasian grocery store owner in the course of a robbery.

2   The case was tried before an all-Caucasian jury.  The California Supreme Court found that the

3   prosecution's use of peremptory challenges violated the defendants' right to trial by a jury drawn

4   from a representative cross-section of the community as guaranteed by the California Constitution.

5   *Wheeler*, 22 Cal. 3d at 283.  In the instant case, the prosecutor used eight peremptory challenges to

6   excuse all African American prospective jurors called to the jury box in a case where two African

7   American defendants were accused of murdering a Caucasian jewelry store owner and shooting a

8   Caucasian store employee in the cheek in the course of a robbery.  Petitioner was tried before a jury

9   of eleven Caucasian jurors and one Hispanic-surnamed juror.  (ECF Doc. No. 397-1, Ex. 1, Decl. of

10   Investigator Melody Ermachild at 9.)  Petitioner's jury contained no members of his race.

11   　　　　Furthermore, by the time of Petitioner's trial, state courts in California had found prima facie

12   cases of racially discriminatory exercises of peremptory challenges in other criminal prosecutions

13   with similar or less troubling numbers than those at Petitioner's trial.  *See, e.g.*, *Hall*, 35 Cal. 3d at

14   168, 170-71 (prima facie case conceded where prosecution used five of eight peremptory challenges

15   to remove all African American prospective jurors); *Allen*, 23 Cal. 3d at 291, 294-95 (prima facie

16   showing found where prosecution struck all fourteen African American prospective jurors);

17   *Johnson*, 22 Cal. 3d at 298-300 (judgment reversed where prosecutor used peremptory challenges to

18   strike one of two African Americans jurors, and declared intent to challenge second African

19   American juror if called to the jury box); *People v. Fuller*, 136 Cal. App. 3d 403, 414-24 (1982)

20   (prima facie showing found under *Wheeler* where prosecutor used peremptory challenges to remove

21   all three African American prospective jurors from the panel).

22   　　　　Considering the strong prima facie evidence here that African American jurors were being

23   struck because of their race, the Court agrees with Petitioner's expert that Petitioner's case presented

24   a situation where a *Wheeler* motion was imperative:

25   　　　　Essentially, this was a classic case for such a motion: when the prosecutor gives notice
26   　　　　to the defense that he intends to exclude eight African American venirepersons in a
   　　　　capital case with two African American defendants and two Caucasian victims, then

27                                          20

28

1

2

3

> strikes all eight African American prospective jurors, and gives notice to the defense that he intends to exclude four more, if called, and defense counsel have rated highly at least four African Americans and did not intend to challenge (and did not challenge) any African American jurors; a reasonably competent defense attorney should and would have objected under *Wheeler*.

4

(ECF Doc. No. 397-1, Ex. 5, Decl. of James Thomson at 55.)

5

6

7

8

9

10

11

12

13

14

15

      Petitioner argues further that his trial counsel's failure to develop a record of the race of prospective jurors contributed to trial counsel's deficient performance.  Petitioner asserts that *Wheeler* imposed such a duty upon defense counsel.  (ECF Doc. No. 397 at 50 (citing *Wheeler*, 22 Cal. 3d at 263).)  The California Supreme Court in *Wheeler* stated that when circumstances suggest that a prosecutor's use of peremptory challenges is denying a defendant's right to trial by an impartial jury, "it is incumbent upon counsel . . . to make a record sufficient to preserve the point for review."  22 Cal. 3d at 163.  Under the circumstances of Petitioner's voir dire proceedings, a reasonable attorney would also have developed a record of the race of prospective jurors in order to raise a *Wheeler* objection.  The relative amount of time spent exercising peremptory challenges underscores trial counsel's failure to develop the record: all peremptory challenges were made in less than thirty minutes even though voir dire proceedings had lasted more than three months.

16

17

18

19

20

21

22

23

24

25

      Critically, there appears to have been no tactical reason for failing to raise a *Wheeler* challenge.  In *Williams v. Woodford*, the African American petitioner was convicted of murder in California state court and sentenced to death by an all-Caucasian jury in 1981.  396 F.3d at 1060 (Rawlinson, J., joined by Pregerson, Reinhardt, Thomas, Wardlaw, W. Fletcher, Fisher, Paez, & Berzon, JJ., dissenting from denial of rehearing en banc).  Because the panel in *Williams* denied a certificate of appealability on the petitioner's *Batson* claim, the panel "failed to address the question of whether trial counsel's failure to object to the prosecutor's discriminatory peremptory challenges gives rise to an ineffective assistance of counsel claim."  396 F.3d at 1060.  The only judges to do so in writing were the nine who signed the dissent from the denial of rehearing en banc.  Going forward, all citations to *Williams* refer to this nine-judge dissental.

26

      The prosecutor in *Williams* used two of his nineteen peremptory challenges to strike the only

27

21

28

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1    two African Americans called to the jury box.  *Id.* at 1061.  The prosecutor also struck the only

2    African American who had been drawn as an alternate.  *Id.*  In *Williams*, as here, "the prosecutor

3    obtained a jury, and an alternate juror pool, that contained not a single African-American."  *Id.*  On

4    these facts, nine judges of the Ninth Circuit concluded that "[a]ny reasonable attorney under the

5    circumstances of this case would have objected to the prosecution's use of peremptory challenges to

6    rid the jury of African-Americans."  *Id.* at 1071.  "We cannot," the nine judges explained,

7    "characterize the failure of Williams' counsel to object to the prosecutor's discriminatory strikes as a

8    permissible 'strategic choice' or 'tactical decision.'"  *Id.*; *see also Hollis*, 941 F.2d at 1478 (finding

9    it "impossible to conclude from [defense counsel's] statements that he had made a reasoned,

10   professional judgment that not raising the issue [of systematic exclusion of blacks from the jury

11   pool] was in [petitioner's] interest").

12          In the instant case, the prosecutor struck every African American called to the jury box and

13   more than twice the number that were struck in *Williams*.  Petitioner's lead trial counsel did not

14   submit a declaration explaining his reasons for not raising a *Wheeler* objection.  Petitioner's other

15   trial counsel, Traback, declared that he has no memory of a strategic or tactical reason for lead trial

16   counsel Mintz to refrain from making a *Wheeler* motion.  (ECF Doc. No. 397-1, Ex. 6 at 68.)  In

17   addition, at least four of the African American prospective jurors struck by the prosecution, were

18   highly rated by the defense: Clarence Spiller (3½ +-), Aunita Jones (5+-), Abdulel Luqman (4), and

19   Willetta Combs (4+-).  Bellas, attorney for Petitioner's co-defendant Hammond, declared that given

20   the high numerical scores the defense gave these four jurors, she was "not aware of any factual,

21   tactical or strategic reason for Mr. Mintz's failure to object," and, in fact, "there was no tactical

22   reason for Mr. Mintz not to object."  (ECF Doc. No. 397-1, Ex. 10, Suppl. Decl. of Diane Bellas at

23   105-06.)  These African American prospective jurors were not on the prosecutor's strike list, but

24   were called to the jury box and struck by the prosecutor.  Despite ample opportunity, Petitioner's

25   trial counsel did not object to these strikes or any others.  Whereas the defense counsel in *Williams*

26   "could have made the motion after the first strike, the second strike, the third strike, or at the

27                                                          22

28

1    conclusion of jury selection," defense counsel here could have done so after the first, second, third,

2    fourth, fifth, sixth, seventh, or eighth strike, as well as at the end of jury selection. *Williams*, 396

3    F.3d at 1072. Moreover, as indicated above and detailed further in Section 3, *infra*, the instant case

4    has far greater evidence establishing a prima facie case than was presented in *Williams*. "Any way

5    you slice it," this Court finds, there was no tactical or strategic reason for Petitioner's counsel to

6    remain silent, and "counsel's failure to object constituted ineffective assistance of counsel." *Id.*

7         Finally, raising a *Wheeler* challenge did not appear to have a downside. (*See* ECF Doc. No.

8    397-1, Ex. 5, Decl. of James Thomson at 53-54 (listing reasons why a reasonable lawyer would have

9    lodged a *Wheeler* objection).) Had a *Wheeler* motion been made, defense counsel would have been

10   able to place the prosecutor and trial court on notice of the challenged conduct, and would have

11   preserved a record for appeal. Had a *Wheeler* motion been granted, a new venire panel would have

12   been empaneled, with a greater chance of obtaining a representative jury. *Id.* As the Sixth Circuit

13   recently explained in the analogous *Batson* context: "The fact that a *Batson* error is structural and

14   requires an adequate remedy lends itself to a conclusion that a failure to object in this case

15   constituted deficient counsel." *Drain*, 595 F. App'x at 583.

16        In light of the above evidence, the Court concludes that trial counsel's failure to make a

17   *Wheeler* motion fell below an objective standard of reasonableness under the prevailing professional

18   norms in existence at the time of Petitioner's trial from December 1983 through May 1984.

19   Petitioner has overcome the "strong presumption" that his trial counsel's failure to object was

20   "sound trial strategy." *Strickland*, 466 U.S. at 689. Thus, Petitioner has established that his trial

21   counsel's performance was deficient. *See Doe*, 782 F.3d at 432 (trial counsel's failure to raise

22   *Wheeler* objection "constituted deficient performance" where prosecutor struck two of four African

23   Americans and one African American was empaneled).

24              **3. Prejudice**

25        In order to prevail on his ineffective assistance of counsel claim, Petitioner need not prove

26   conclusively that the trial court would have sustained a *Wheeler* objection. Rather, Petitioner must

27                                                    23

     Case No. 97-CV-03825-LHK
28   ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1    demonstrate only a "reasonable probability" that he would have prevailed on a *Wheeler* challenge

2    had it been raised by his trial counsel.  *Carrera*, 699 F.3d at 1108.  For the reasons discussed below,

3    Petitioner carries this burden.

### a.  Prima Facie *Wheeler* Case

5    To evaluate whether a hypothetical *Wheeler* objection would have had a reasonable

6    probability of success, the Court must assess the strength of that objection.  As outlined in Section 1,

7    *supra*, the first step in establishing a *Wheeler* violation is to show a prima facie case of unlawful

8    discrimination.  To establish a prima facie case, a party (1) should make as complete a record of the

9    circumstances as is feasible; (2) must establish that the excluded persons are members of a

10   cognizable group within the meaning of the cross-section rule; and (3) from all of the circumstances

11   of the case, must show a strong likelihood that such persons are being challenged because of their

12   group association rather than because of any specific bias.  *Wheeler*, 22 Cal. 3d at 280.  Specific bias

13   is "a bias relating to the particular case on trial or the parties or witnesses hereto."  *Id*. at 276.

14   For the reasons discussed in Section 2, *supra*, the evidence in Petitioner's case was sufficient

15   to establish a prima facie *Wheeler* violation had a *Wheeler* objection been raised.  First, considering

16   that the prosecutor struck every African American called to the jury box, a reasonable attorney

17   would have developed a record of the race of prospective jurors.  Second, the excluded African

18   American prospective jurors were members of a cognizable group within the meaning of the cross-

19   section rule.  *See Fuller*, 136 Cal. App. 3d at 415 n.8 ("Blacks . . . have long been held to be a

20   cognizable group.").  Third, based on all of the circumstances of his case, Petitioner would have

21   been able to show a strong likelihood that prospective African American jurors were being

22   challenged because of their group association rather than because of any specific bias.

23   As detailed above: (1) the prosecutor struck 100 percent (eight of eight) African American

24   jurors from the venire and used a disproportionate number of peremptory challenges (eight of

25   fifteen) against them; (2) the prosecutor's strike list demonstrated to defense counsel an intent to

26   strike four additional African American jurors; (3) four of the struck jurors were highly rated by the

27                                                              24

28

defense; (4) the African American jurors were of diverse ages, genders, employment, and social status and had only their group identification in common; (5) the prosecutor failed to engage several of the African American jurors in more than desultory voir dire; (6) Petitioner and his co-defendant were African American, the same race as the excluded jurors, and both victims were Caucasian; (7) the prosecutor struck Caucasian prospective jurors who evidenced potential sympathy for African Americans; (8) the voir dire of three African American jurors revealed no evidence of specific bias and suggested they should have been favorable to the prosecution; and (9) the prosecutor did not strike Caucasian jurors who either preferred life without parole or equivocated on the death penalty. These circumstances establish a strong likelihood that the African American jurors were challenged because of their group association. *See, e.g.*, *Hall*, 35 Cal. 3d at 168 (noting it was "concede[d] that defendant established a prima facie case of group bias by demonstrating that five of eight peremptory challenges were used to remove black jurors, and that none remained on the jury"); *Allen*, 23 Cal. 3d at 294-95 (prima facie case established where district attorney challenged each of fourteen African American jurors who were tentatively seated, excluded jurors included both men and women, including individuals whose background indicated that absent their race, they would have been considered desirable jurors, excluded jurors had been engaged only in desultory voir dire, defendants were African American, and victim was Caucasian); *see also Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (prima facie case when the prosecutor struck four out of seven (57 percent) Hispanics, and 21 percent (four out of nineteen) of the prospective juror challenges were made against Hispanics who constituted only about 12 percent of the venire).

### b. Prosecutor's Burden to Justify Every Strike

With a prima facie case established, the trial court would have moved to step two, had Petitioner's counsel raised a *Wheeler* objection. At step two, the burden would have shifted to the prosecution to show that the peremptory challenges in question were not predicated on group bias alone. *Wheeler*, 22 Cal. 3d at 281. The prosecution would then bear the burden of justifying *each* peremptory challenge in question. *Id*. at 282. In *Wheeler*, the California Supreme Court stated:

25

1
2
3
4
5

> If the court finds that the burden of justification is not sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected.  So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire – not one that has been *partially* or totally stripped of members of a cognizable group by the improper use of peremptory challenges.  Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew.

6
7
8
9
10
11
12
13
14

*Id.* (emphases added); *see also People v. Fuentes*, 54 Cal. 3d 707, 715 (1991) (explaining that, under *Wheeler*, "*every* questioned peremptory challenge must be justified" (emphasis added)); *People v. Rojas*, 11 Cal. App. 4th 950, 956 (1992) (same).  A *Wheeler* violation, thus, occurs even if a single peremptory challenge was based on group-bias.  *Wheeler*, 22 Cal. 3d at 282; *see Fuentes*, 54 Cal. 3d at 715 (reiterating that "the striking of a single black juror for racial reasons violates the equal protection clause" (internal quotation marks omitted)); *see also Carrera v. Ayers*, 670 F.3d 938, 953 (9th Cir. 2011) (Tashima, J., dissenting) ("A [*Wheeler*] violation occurs, and a new jury must be drawn, if even a single peremptory was based on group-bias."), *superseded on reh'g en banc*, 699 F.3d 1104 (9th Cir. 2012).

15
16
17
18
19
20
21
22
23
24
25
26

As noted previously, the following eight qualified African American jurors were called to the jury box, and every one of them was struck: Willetta Combs, Aunita Jones, Abdulel Luqman, Clarence Spiller, Sharon Penn, Patricia Fuller, Charles Threets, and Beverly Frazier.  The prosecutor never submitted a declaration explaining his justifications for his peremptory challenges.  Respondent suggests post hoc that some of the African American jurors, including Combs, were struck because they were equivocal about the death penalty, even though all of these jurors were death qualified.  (ECF Doc. No. 403 at 21-28.)  Respondent fails, however, to meet his burden of articulating a justification for each and every peremptory challenge.  *See Wheeler*, 22 Cal. 3d at 282 ("If the court finds that the [prosecution's] burden of justification is not sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is rebutted." (emphasis added)).  The Court's review of the voir dire transcripts reveals that, at a minimum, the peremptory challenge of prospective juror Willetta Combs, whom the prosecutor himself intended to keep "if necessary to

27
28

26

avoid *Wheeler*," (ECF Doc. No. 397-2, Ex. 14 at 19), but eventually struck, was not justified on any nondiscriminatory basis.  Additionally, as further discussed below, it appears from the record that prospective jurors Abdulel Luqman and Charles Threets should have been desirable to the prosecution but for their race.

### i. Willetta Combs

Willetta Combs, an eighteen-year veteran of the U.S. Postal Service, expressed no conscientious opinions about the death penalty that would automatically make her vote against it.  RT 281, 293.  At first, Combs was questioned by the trial court:

> Q.  You don't have anything which would prevent you from picking [the death penalty or life without parole]?
>
> A.  No.
>
> Q.  You would not always and automatically vote for life without possibility of parole; right?
>
> A.  No.

RT 281.  When the prosecutor questioned her, their initial exchange proceeded as follows:

> Q.  You just indicated to Judge Golde that should it become your responsibility as a trial juror in this case where the imposition of penalty is a jury function that you would maintain an open mind, and you could in a given case either impose the death penalty, depending upon the circumstances, or you could vote for life imprisonment without parole.  Is that true?
>
> A.  That is true.
>
> Q.  Do you have any particular feelings about the question – about the death penalty?  Do you have any personal feelings about it?
>
> A.  Again, as I say before, it all depends on the circumstances of what it was about.  Otherwise, there's no feeling one way or the other.

RT 282-83.

Later during the prosecutor's questioning, Combs stated she had recently discussed the death penalty with her husband.  RT 283-84.  The following exchange occurred:

> Q.  And did [your husband] at that time express any particular feelings to you about the death penalty?

27

A.  No.  I think basically he feels the way I do.  It depends on the circumstances and the evidence that's presented before you and what the case is about.

Q.  So you're of a mind then that you feel the death penalty is an appropriate penalty in some cases?

A.  Yes.

Q.  And there are other cases where there may be a death involved where it's not appropriate?

A.  That's true.  I believe that.

RT 284.  No less than five times, Combs told the prosecutor that her decision whether or not to impose the death penalty would depend on the evidence presented.  RT 282-85.  She reiterated later that she believed in the justice system, and she expressed "[n]o doubt at all" that she would follow the law as instructed even if she disagreed with it.  RT 286-87.  She stated that she could approach Petitioner's case with complete fairness and an open mind.  RT 291.  When asked if she had been "treated fairly by the police" after she had called them to report a car accident, she said, "Yes."  RT 288.  Combs stated further that she had no prejudice against police officers, that she had a friend who was a police officer, and that her daughter had an application for employment pending with the sheriff's department.[8]  RT 288, 294, 296.  Combs had also served on two prior criminal juries.  RT 285-86, 297.

At the end of the prosecutor's questioning on the death penalty, Combs and the prosecutor had the following exchange:

Q.  The question here then is whether or not if you're selected as a juror, Ms. Combs, whether or not you, as a juror, if it becomes your responsibility to determine the matter of death or life without parole, whether you could in a given case vote personally for the death penalty.

A.  I would say I could.

Q.  You have reservations about that?

A.  No.  It just depends on what you say, on what the evidence was if I had to vote on it.

_____

[8] The prosecutor's notes about Combs state: "daughter has application with sheriff."  (ECF Doc. No. 397-1 at 117.)

28

1    Q. Do you have leanings? Do you lean either one way or the other in your own personal
     views? Do you lean more towards life imprisonment as a proper penalty?

2

3    A. I believe I do, yes.

     Q. But considering what has been said, you, in fact, could impose a death penalty, at
4    least you believe you could in a given case?

5    A. Yes, I do believe I could.

6    RT 284-85. Although her answer, "I believe I do, yes," may have suggested that she leaned toward

7    life imprisonment, Combs, whom the trial court found to be death qualified, did not harbor opinions

8    that would prevent her from voting for death. In fact, she stated five times that she would be guided

9    by the evidence in making her decision. The record bears no evidence of specific bias, nor any

10   suggestion that she could not fairly decide the question of penalty. After the prosecutor had

11   questioned Combs extensively on her death penalty views, he told the trial court, "I'll pass for

12   cause." RT 285.

13        Further, the prosecutor's own trial notes, which admittedly would not have been available to

14   defense counsel at the time of trial, state: "She has some feelings about death penalty – but could

15   impose it in a given case. I think she would be alright but she does have some reservations about

16   death – Keep if necessary to avoid *Wheeler* – She would try to be fair." (ECF Doc. No. 397-2, Ex.

17   14 at 19) As defense attorney Bellas stated, this note shows that the prosecutor "contemplated that

18   he would be excluding African American venirepersons and that he might therefore have to contend

19   with defending his challenges against a *Wheeler* motion." (ECF Doc. No. 397-1, Ex. 10 at 104.) In

20   fact, the prosecutor's apparent backup plan to keep Combs on the jury just to avoid a *Wheeler*

21   challenge is precisely the type of tactic the California Supreme Court aimed to curb in *People v.*

22   *Snow*, 44 Cal. 3d 216, 226 (1987), when the court found that a prosecutor allowing two African

23   Americans to serve on a jury was not dispositive in evaluating a *Wheeler* challenge because,

24   otherwise, "any attorney can avoid the appearance of systemic exclusion by simply passing the jury

25   while a member of the cognizable group that he wants to exclude is still on the panel." The

26   prosecutor's backup plan, of course, never had to be tested in this case because defense counsel

27                                              29

28   Case No. 97-CV-03825-LHK
     ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1   remained silent while the prosecutor struck every African American juror.

2       To the extent Combs's response might be deemed equivocal as to whether she preferred life

3   imprisonment to the death penalty, the prosecution did not challenge non-African American jurors

4   who expressed similar ambivalence. *See People v. Trevino*, 39 Cal. 3d 667, 690 (1985) (explaining

5   that "disparate treatment of the members of the excluded group and the unchallenged jurors is

6   indicative of group bias" (citing *Hall*, 35 Cal. 3d at 168)).  In fact, four non-African American jurors

7   who served on Petitioner's jury shared Combs's ambivalence.  Joan Klenk, who was Caucasian,

8   expressed mixed feelings, stating unequivocally at one point: "Yes, I do lean more toward life

9   imprisonment."  RT 3086.  Similarly, non-African American juror Jesus Corrales stated

10  unequivocally that "[l]ife imprisonment" would be the appropriate punishment for someone, like

11  Petitioner, who was convicted of first-degree murder in the course of a robbery.  RT 2314-15.  Casey

12  Garvin, another Caucasian juror, said he thought the death penalty was "just punishment" in some

13  cases but "[o]therwise, it's too extreme."  RT 2284.  When asked by defense counsel when he

14  thought the death penalty should be imposed, Garvin responded: "I guess for mass murder.  Extreme

15  cases like that.  That's about it."  RT 2287.  Patricia Charron, also Caucasian, admitted that she was

16  "on the fence . . . because I don't really like either" the death penalty or life without parole.  RT

17  2739-40.  Charron said she could set aside her feelings and, like Combs, vote to impose the death

18  penalty.  RT 2741.  Neither Klenk, nor Corrales, nor Garvin, nor Charron was struck by the

19  prosecutor.

20      Multiple Caucasian jurors who served as alternates on Petitioner's jury also expressed

21  concerns over the death penalty.  Robert Goodwill, a Caucasian male, stated that "in most cases" he

22  would lean toward imposing life without parole because "when you decide to take somebody's life,

23  you're dealing with a very serious subject there."  RT 3853-54.  Kim Moore, also Caucasian, said

24  the following when asked about the death penalty: "To me, it's kind of a scary thing.  If I ever was a

25  part of imposing it on anyone, I'd – I'd really have to think twice about it.  More than twice.  I don't

26  know.  It's real serious.  It's pretty scary to me."  RT 3270-71.  Despite these reservations, the

27  30

28

1    prosecutor struck neither.

2         Nor did the prosecutor strike Caucasian juror Linda Bailey, who said she "would tend do go

3    towards life in prison without possibility of parole," RT 76; Caucasian juror Guy Attwood, who

4    stated he "would prefer that someone else [serve as juror]" because he "never expected to be a juror

5    where I would be determined – you know, where I would make the choice of that – in that capacity,"

6    RT 587; or Caucasian juror Clyde Stout, who disclosed that his brother was "currently on probation"

7    after having been arrested and tried for illegally "cultivating marijuana," RT 3468, 3472.  Although

8    these three jurors did not serve on Petitioner's jury because they were ultimately struck by the

9    defense, the prosecutor had the opportunity to strike each of them but declined to do so.

10        Respondent counters, without citation, that comparative juror analysis – whereby questions

11   to and answers from similarly situated jurors are compared in an effort to uncover the actual

12   motivations behind a peremptory challenge, *see Miller-El v. Drake*, 545 U.S. 231, 241 (2005) –

13   would not have been performed by the trial court at the time of Petitioner's trial in 1984.  (ECF Doc.

14   No. 403 at 18.)  Respondent is mistaken.  As early as 1978, in *Wheeler* itself, the California Supreme

15   Court recognized the utility of comparing similarly situated struck and non-struck jurors when

16   proving or disproving racial discrimination during jury selection.  22 Cal. 3d at 282 ("[The

17   prosecutor], too, may support his showing by reference to the totality of the circumstances: for

18   example, it will be relevant if he can demonstrate that in the course of this same voir dire he also

19   challenged similarly situated members of the majority group on identical or comparable grounds.").

20   The California Supreme Court confirmed its position five years later in *Hall*, explaining that the trial

21   court's failure to evaluate the prosecutor's proffered explanation for peremptory challenges was

22   underscored by instances where the prosecutor challenged African American jurors ostensibly due to

23   certain factors in their backgrounds, but did not challenge Caucasian jurors with similar factors.  *See*

24   *Hall*, 35 Cal. 3d at 168 (observing that "nonblack jurors were not asked where they had lived before

25   coming to California" and "other nonblack, female jurors who were not challenged had grown

26   children"); *cf. Trevino*, 39 Cal. 3d at 690-92 (citing *Hall* in endorsing comparative juror analysis in

27                                          31

28   Case No. 97-CV-03825-LHK
     ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1    1985, one year after Petitioner's trial).[9]  Without doubt, comparative juror analysis was used as an

2    analytical tool at the time of Petitioner's trial in 1984.

3          Moreover, there is additional evidence in the record that, although not available to

4    Petitioner's trial counsel at the time, is probative of whether a *Wheeler* objection to Combs's

5    removal was reasonably likely to have succeeded.  *See Hall*, 35 Cal. 3d at 167-68 (imperative that a

6    court satisfy itself that explanations for peremptory challenges are genuine, and distinguish bona fide

7    reasons from sham excuses contrived to avoid admitting acts of group discrimination).  For instance,

8    the prosecutor's notes expressed his intent to keep Combs "if necessary to avoid *Wheeler*," (ECF

9    Doc. No. 397-2, Ex. 14 at 19); speculated that Diane Weston, a Caucasian juror whom the

10   prosecutor struck, had an African American husband (ECF Doc. No. 397-2, Ex. 14 at 20); and kept

11   track of the race of only African Americans and gave all but one of them a "failing grade" (ECF

12   Doc. No. 397-2, Ex. 15, Deposition of Albert Meloling in *Hovey v. Calderon*, No. 89-01430-MHP,

13   at 26).  Any speculation regarding the prosecutor's reasons for exercising peremptory challenges to

14   remove all African Americans from the jury must be viewed in light of the probative value of direct

15   evidence suggestive of improper racial motives.[10]  *Cf. Paulino v. Castro*, 371 F.3d 1083, 1090 (9th

16   Cir. 2004) ("[I]t does not matter that the prosecutor might have had good reasons to strike the

17   prospective jurors.  What matters is the *real* reason they were stricken."); *United States v. Omoruyi*,

18   7 F.3d 880, 882 (9th Cir. 1993) ("A pattern of discrimination is not necessary if there is evidence

19   which reveals a discriminatory motive in challenging jurors.").

20         Thus, considering Combs's voir dire responses evidencing "[n]o doubt at all" that she could

21

22         [9] To be sure, the California Supreme Court later disapproved of *Trevino*'s full-throated
     endorsement of comparative juror analysis.  *See People v. Johnson*, 47 Cal. 3d 1194, 1219-22
23   (1989).  *Johnson*, however, was decided five years after Petitioner's trial, and this Court must look
     to "the prevailing law in California" at the time of jury selection, which included *Hall*.  *Burks v.
24   Borg*, 27 F.3d 1424, 1428 (9th Cir. 1994).

25         [10] Respondent's brief argues that the record "does not establish that Meloling was a racist."
     (ECF Doc. No. 379 at 27.)  That is not the question before the Court, however.  The question is
26   whether the record shows that the prosecutor tried to gain an impermissible advantage at trial by
     systematically excluding members of Petitioner's race from the jury.

27                                         32
28   Case No. 97-CV-03825-LHK
     ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1    follow the law and vote to impose the death penalty in certain circumstances, the trial court's finding

2    that she was death qualified, the prosecutor's own notes suggesting improper motive, and the fact

3    that non-African Americans who expressed greater misgivings about the death penalty were

4    ultimately seated on Petitioner's jury, the Court concludes that the prosecutor would not have

5    succeeded in rebutting the prima facie *Wheeler* case as to Combs.  That failure, alone, establishes a

6    reasonable probability that a *Wheeler* objection would have prevailed had it been made.  *See*

7    *Wheeler*, 22 Cal. 3d at 282 ("If the court finds that the [prosecution's] burden of justification is not

8    sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is

9    rebutted." (emphasis added)); *see also Fuentes*, 54 Cal. 3d at 715 (confirming that "*every* questioned

10   peremptory challenge must be justified" under *Wheeler* (emphasis added)).

### ii.  Abdulel Luqman and Charles Threets

12       The prosecutor's decision to strike Luqman and Threets gives the Court further pause.

13   Abdulel Luqman, a manufacturing representative for Electronic Research Co. with a bachelor's

14   degree in business engineering, RT 862, provided somewhat rambling responses, but did not

15   demonstrate any bias.  Although he had strong feelings for the "preservation of life," he stated that

16   he would be able to impose the death penalty.  RT 852.  He believed that in certain situations, if a

17   person "committed certain acts against another individual . . . their life should be taken."  RT 855.

18   Luqman expressed some criticism of the judicial system – he thought courts could be more efficient,

19   RT 864, and that plea bargains are unfair – but he denied that these feelings would affect his

20   judgment.  RT 868.  At one point, the prosecutor stated to him: "You're a young black man,

21   educated, articulate.  Do you have any question in your mind as to whether or not two young black

22   men can receive a fair trial in this courtroom?"  RT 865.  In response, Luqman initially stated that he

23   "wasn't satisfied that they can," but clarified that an African American could receive a fair trial if

24   judged by a collection of his peers, RT 869, reiterated that the justice system was in fact color blind,

25   RT 867, and affirmed that his personal feelings would not affect his judgment, RT 867, 870.  Later,

26   Luqman also stated that his brother was a police officer, his sister was a correctional officer, and

27                                                          33

another brother was a youth counselor.  RT 875.  Given Luqman's balanced views, ability to impose the death penalty, and close family members in law enforcement, he should have been a desirable juror for the prosecution, but for his race.

The voir dire record of Charles Threets suggests he also should have been desirable to the prosecution.  Threets was a metal polisher whose two brothers were deputy sheriffs in San Francisco.  RT 3540.  He denied having any feelings against the death penalty, RT 3536, and stated that he could vote to impose it, RT 3537.  The only portion of his voir dire transcript that implicates any potential bias involves the following exchange with the prosecutor:

Q. And you don't have any feelings, Mr. Threets, that the death penalty is only involved – is only imposed on minorities?  Do you have that feeling?

A. No.

Q. Have you heard that expressed?

A. Yeah, I have heard sometimes expressed like that.

Q. Do you agree with that?

A. Sometimes I wonder.

. . .

Q. You've indicated then that you do have some feeling about there being an unfairness with respect to the application of the death penalty?

A. Yeah, I do.

Q. The fact that you have that feeling of unfairness, do you think that would prevent you from being objective and fair in deciding the question of guilt or innocence in this case?

A. I don't think so.

RT 3540-41.

As indicated above, Threets stated that he believed that the death penalty was sometimes applied unfairly to minorities, but also asserted that this view would not prevent him from making fair decisions in Petitioner's case.  Threets thus denied that his views would affect his ability to be impartial, but was nonetheless peremptorily challenged by the prosecutor.  Moreover, Threets had

34

1   close family members – two brothers – who were deputy sheriffs.  On this record, the Court finds

2   that but for his race, Threets should have been a desirable juror for the prosecution.  Nonetheless,

3   giving Respondent the benefit of every doubt with respect to Luqman, Threets, and the other five

4   American Americans struck, Respondent's failure to establish a nondiscriminatory basis for striking

5   Combs would have been sufficient for the trial court to sustain a *Wheeler* objection, if one had been

6   made.  *See Wheeler*, 22 Cal. 3d at 282.

7                                    **c. Differential Questioning**

8               The Court notes further that the prosecutor engaged in a pattern of differential questioning in

9   which he asked certain questions only of African American prospective jurors.  "Such disparate

10  treatment [of jurors]," said the California Supreme Court in 1983, "is strongly suggestive of bias."

11  *Hall*, 35 Cal. 3d at 168.  The prosecutor, for example, asked African American prospective jurors

12  whether they thought the death penalty was enforced disproportionately against minorities.  In

13  particular, he asked Keith Smith, an African American who was not called to the jury box, "Have

14  you formed the opinion that the death penalty's not been enforced equally, that is, to all people who

15  come before the court, blacks, whites, yellows and so forth? . . .  Do you have the feeling that the

16  death penalty is now enforced in California against minorities and not enforced equally against

17  whites?"  RT 2144-45.  The prosecutor asked Anthony Pigrum, another African American who was

18  not called to the jury box, "There's a point of view that's expressed that capital punishment, the

19  death penalty, is not proper because it's administered unequally to members of minority groups . . .

20  Do you agree with that view?"  RT 1040.  The prosecutor did not ask non-African American jurors

21  whether they thought that the death penalty was reserved for minorities.

22              In the same vein, the prosecutor repeatedly questioned African American jurors about

23  whether they thought that the criminal justice system treated them differently, but did not ask this

24  question of non-African American jurors.  For instance, he asked Aunita Jones, one of the African

25  American jurors he struck, "Did you have a chance to think about whether or not these two

26  defendants who are young black men can get a fair trial here?  Do you have any feelings about

27                                              35

28  Case No. 97-CV-03825-LHK
    ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
    INEFFECTIVE ASSISTANCE OF COUNSEL

that?"  RT 734.  The prosecutor asked Luqman, another struck African American juror: "Do you

have any question in your mind as to whether or not two young black men can receive a fair trial in

this courtroom?"  RT 865.  Nathaniel Fripp, an African American who was not called to the jury

box, was asked, "Mr. Fripp, do you have any question in your mind as to whether or not in our

society in 1983, December, whether or not two black men can be tried in California under our

system and be given a fair and just trial?"  RT 443.  Another African American who was not called

to the jury box, Cheryl Favroth, was asked, "Do you have any feelings at all that the two defendants

can not receive a fair trial under our system? . . .  Is that a feeling that you have about the system

generally, that minorities are not treated fairly in the courts?"  RT 1971-72.

        The prosecutor also asked African American jurors whether the fact that the defendants were

African American would affect their ability to be fair or vote for the death penalty.  For example, the

prosecutor asked Favroth, "Do you have any feelings at all that – the two defendants are black and

you're black . . . Do you think your feelings about minorities in the system, would cause you to put a

greater burden on me representing the people of the state than I would have under the law?"  RT

1971-73.  He asked Pigrum, "You know the two defendants are two young black men . . .  Can you

picture yourself in the situation where that becomes your responsibility where under the

circumstances you could vote to put either one of them to death?"  RT 1041.  Fripp was asked, "So

that in the event that the evidence during the course of the trial should establish that the two victims

were white, Caucasian, and, obviously, the two defendants are black, that wouldn't in any way affect

your ability to objectively evaluate the evidence, would it?"  RT 443-44.  Lastly, the prosecutor

asked Hubert Martin, an African American who was not called to the jury box, "And you feel that if

you were selected as a trial . . . juror in a case involving young black defendants and if the

circumstances warranted it that you would be able to vote to put either one or both [to death]?"  RT

1417.

        The prosecutor did not pursue this line of questioning with non-African American jurors,

with the notable exception of Caucasian prospective juror, Alan Dundes, who had written a book on

36

African American folklore and had expressed concern about the "disproportionate" sentencing of poor people and African Americans.  RT 1729.  The prosecutor asked of him: "Do you think your feeling of sympathy towards these two defendants during the penalty phase would affect your ability to objectively and fairly evaluate the evidence on the question of guilt or innocence?"  RT 1733. Dundes said "No," but the prosecutor struck Dundes anyway.

The Ninth Circuit has indicated that asking potential jurors differential, ethnicity-based questions (such as asking Hispanic-surnamed venirepersons whether the fact that the defendant was "of Spanish descent" would affect their deliberations) can be permissible because "asking questions about potential bias is the purpose of voir dire." *Carrera*, 699 F.3d at 1111.  This was so in *Carrera* in part because "[defense] counsel also asked ethnicity-based questions" of Hispanic surnamed venirepersons. *Id.*  Here, in contrast, Respondent has made no showing that defense counsel engaged in anything approaching the pattern of differential questioning employed by the prosecutor. *See, e.g.*, RT 95 (Traback, Petitioner's second counsel, asking Linda Bailey, a Caucasian prospective juror, whether Petitioner's status as "a black man" would affect her "judgment as to his credibility"). What's more, the differential questioning here was not limited, as in *Carrera*, to whether non-Caucasian jurors could impartially sit in judgment of defendants of their same race.  Rather, African Americans were asked broader questions about their views of the criminal justice system and whether the death penalty was enforced disproportionately against minorities.  While "asking questions about potential bias is the purpose of voir dire," *Carrera*, 699 F.3d at 1111, such differential questioning is still probative of whether a hypothetical *Wheeler* objection was reasonably likely to have succeeded.  As indicated above, the California Supreme Court made clear one year before Petitioner's trial that "disparate treatment" of jurors in questioning "is strongly suggestive of bias." *Hall*, 35 Cal. 3d at 168.

### d. Ninth Circuit Precedent

Petitioner's case can be further distinguished from *Carrera*, which Respondent does not cite. In *Carrera*, the Ninth Circuit sitting en banc affirmed the district court's denial of Carrera's

37

1  ineffective assistance of counsel claim, finding that Carrera was not prejudiced by his trial counsel's

2  failure to object under *Wheeler* to the prosecutor's exercise of peremptory challenges against 75

3  percent (six of eight) of the Hispanic-surnamed venirepersons.  *Carrera*, 699 F.3d at 1107-11.  The

4  court so held because there were obvious, nondiscriminatory reasons for striking five of the six

5  struck jurors, two Hispanic-surnamed jurors were ultimately seated on the jury, and one Hispanic-

6  surnamed juror was seated as an alternate.  *Id.* at 1108.

7        In reaching its decision, the Ninth Circuit relied on two rulings from the California Court of

8  Appeal to "highlight how difficult it would have been" for Carrera, who was tried in 1983, "to

9  establish a prima facie case in these circumstances."  *Id.*  The critical factor in both state court

10  decisions, according to the en banc panel, was the presence of African Americans on the actual jury.

11  The Ninth Circuit explained that in *People v. Boyd*, 167 Cal. App. 3d 36, 49-50 (1985), the

12  California Court of Appeal found "no prima facie case had been established under *Wheeler because*

13  two black jurors were seated on the jury.  *Carrera*, 699 F.3d at 1108 (emphasis added).  Similarly,

14  the Ninth Circuit emphasized that in *People v. Davis*, 189 Cal. App. 3d 1177, 1191 (1987), "the

15  prosecutor peremptorily challenged six black venirepersons, but allowed three black jurors to be

16  seated."  *Carrera*, 699 F.3d at 1108.  To explain the state court's reasoning, the Ninth Circuit quoted

17  from *Davis* at length: "The presence of two and then three members of the cognizable group in the

18  jury box at all times afforded the defendant a representative cross-section of the community and

19  afforded equal protection to all, the defendant, the prospective jurors excused and the community at

20  large."  *Id.* (brackets omitted) (quoting *Davis*, 189 Cal. App. 3d at 1191).  In the view of an en banc

21  panel of the Ninth Circuit, thus, California courts around the time of Carrera's – and Petitioner's –

22  trial were especially concerned about whether members of the challenged group were actually seated

23  on a defendant's jury.[11]

24  ───────────────

25        [11] *Boyd* and *Davis* were overruled in 1987, three years after Petitioner's trial.  *See Snow*, 44
    Cal. 3d at 225-26.  Specifically, the California Supreme Court disapproved of the language in *Davis*

26  suggesting that the mere "presence of two or three Blacks in the jury box following voir dire
    precludes the trial court from finding a prima facie case of exclusion."  *Id.*  The simple fact that "the

27                                                      38

28

1    Here, unlike in *Carrera*, *Boyd*, or *Davis*, not a single African American was seated either as a

2    juror or as an alternate.  Indeed, the prosecutor exercised peremptory challenges against 100 percent

3    (eight of eight) of the African American prospective jurors, he expressed to defense counsel an

4    intent to challenge four additional African American prospective jurors, and his notes demonstrate

5    intent to strike even more African American jurors (a total of sixteen).  The struck jurors, who were

6    heterogeneous in gender, occupation, and socioeconomic status, had only their race in common.

7    Furthermore, there was no extrinsic evidence in *Carrera* of prosecutorial intent to exclude

8    minority jurors.  Indeed, according to the original panel's opinion, the prosecutor had filed a

9    declaration five years after jury selection, which stated: "I know I didn't kick off any jurors just

10   because they were Hispanic.  Race was never a cause for me to excuse any juror."  *Carrera v. Ayers*,

11   670 F.3d 938, 948 (9th Cir. 2011), *superseded on reh'g en banc*, 699 F.3d 1104 (9th Cir. 2012).  In

12   the instant case, by contrast, the prosecutor kept track of the race of only African American jurors

13   and gave all but one a failing grade; he planned to keep Combs "if necessary to avoid *Wheeler*,"

14   suggesting awareness that his striking of African American jurors may have been improper; he gave

15   defense counsel notice of eight African American jurors he intended to strike before striking four

16   more not on that list; he struck Caucasian jurors who evinced potential sympathy for African

17   Americans, noting for one of these Caucasian jurors, "Think her husband is black"; he struck

18   African American jurors who very well might have been favorable to the prosecution; and he did not

19   challenge Caucasian jurors who preferred life without parole or equivocated on the death penalty.

20   Another important distinction between the instant case and *Carrera* is that in *Carrera* the

21   court found no prima facie *Wheeler* case would likely have been established.  *See Carrera*, 699 F.3d

22   at 1108 (emphasizing "how difficult it would have been for Carrera to establish a prima facie case"

23   in light of *Boyd* and *Davis* because two Hispanic-surnamed jurors served on Carrera's jury and one

24

25   jury panel contains at least a minimum number of members of the cognizable group," the Court held,
     does not mean that a defendant "cannot complain of the prosecutor's pattern of unlawful
26   discrimination in the use of his peremptory challenges."  *Id.* at 226.

27                                                        39
28   ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL

1   Hispanic-surnamed juror was seated as an alternate).  Consequently, the court in *Carrera* never had

2   to reach *Wheeler*'s second step and decide whether it was likely that the prosecutor could have

3   justified striking the single juror for whom there was "no obvious non-discriminatory reason to

4   challenge."  *Id.*  Here, on the other hand, there is significant evidence establishing a prima facie

5   *Wheeler* case.  *See supra* Section 2.  As a result, the Court considers *Wheeler* step two, and the

6   prosecutor's inability to justify striking even one African American juror (i.e., Combs) on a

7   nondiscriminatory basis becomes dispositive.  *See Wheeler*, 22 Cal. 3d at 282 ("If the court finds

8   that the [prosecution's] burden of justification is not sustained as to *any* of the questioned

9   peremptory challenges, the presumption of their validity is rebutted." (emphasis added)).

10      Just as *Carrera* is distinguishable, so too is the Ninth Circuit's recent decision in *Doe v.*

11  *Ayers*.  As noted previously, the prosecutor in *Doe* struck 50 percent (two of four) of the African

12  American prospective jurors, and one African American was ultimately empaneled for the

13  petitioner's 1984 jury trial.  *Doe*, 782 F.3d at 428 n.3, 432.  The Ninth Circuit concluded that trial

14  counsel's failure to raise a *Wheeler* objection "constituted deficient performance" under *Strickland*.

15  *Id.* at 432.  However, the court, relying on *Carrera*, held that the prosecutor's "statistically disparate

16  use of strikes" and "selective questioning" in that case "was insufficient" to show a "reasonable

17  probability that the claim [counsel] failed to raise at trial would have prevailed."  *Id.* at 432-33.  In

18  contrast, again, the prosecutor here struck 100 percent (eight of eight) of the African American

19  prospective jurors, he planned to challenge eight additional African Americans (four from his list

20  and four in his notes), there is ample circumstantial evidence of intent to exclude African American

21  jurors, and, critically, there were no African Americans ultimately empaneled.  Petitioner's case is a

22  far cry from *Carrera* and *Doe*.

23      Furthermore, the reasonable probability of success of Petitioner's *Wheeler* motion, had one

24  been raised, is underscored by the numerous California state court decisions reversing judgments

25  based on alleged *Wheeler* violations shortly before or at the time of Petitioner's trial.  *See, e.g.*, *Hall*,

26  35 Cal. 3d at 170-71; *Allen*, 23 Cal. 3d at 294-95; *Johnson*, 22 Cal. 3d at 298-300; *Fuller*, 136 Cal.

27                                                40

28  Case No. 97-CV-03825-LHK
    ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
    INEFFECTIVE ASSISTANCE OF COUNSEL

App. 3d at 414-24.  Indeed, as nine judges of the Ninth Circuit have explained, such "California

Supreme Court cases reversing the judgments . . . make clear that defense attorneys were making

*Wheeler* motions under similar circumstances at that time."  *Williams*, 396 F.3d at 1071.  "These

cases also make clear," the judges continued, "that if [Petitioner's] trial counsel had made a *Wheeler*

motion, *there is a reasonable probability that he would have succeeded*."  *Id.* (emphasis added).

Cases decided not long after Petitioner's trial highlight this trend further.  *See, e.g.*, *People v.*

*Turner*, 42 Cal. 3d 711, 714-15 (1986) (judgment reversed where prosecutor used peremptory

challenges to strike all three African American jurors, and trial judge failed to carefully examine

proffered explanations for the strikes).

        The reasonable probability of success of Petitioner's hypothetical *Wheeler* motion also

undermines confidence in the outcome of his trial because a *Wheeler* violation is prejudicial per se.

*Wheeler*, 22 Cal. 3d at 283 (explaining that when the right to an impartial jury has been violated, "no

inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so

selected must be set aside"); *see also Turner*, 42 Cal. 3d at 728 (*Wheeler* violation is prejudicial per

se); *People v. Singh*, 234 Cal. App. 4th 1319, 1330 (2015) (erroneous denial of *Wheeler-Batson*

motion is structural error); *cf. Drain*, 595 F. App'x at 583 ("Where counsel's ineffective

representation lets stand a structural error that infects the entire trial with an unconstitutional taint,

there is no question that Petitioner and our system of justice suffered prejudice."); *Eagle*, 279 F.3d at

943 (appellate counsel's decision to omit meritorious *Batson* claim from brief undermines

confidence in the outcome of direct appeal sufficient to satisfy prejudice prong of *Strickland*).  As

noted by the Eleventh Circuit in *Hollis*, "In *Strickland* terms, if we compared the result reached by

an all white jury, selected by systematic exclusion of blacks, with the result which would have been

reached by a racially mixed jury, we would have greater confidence in the latter outcome, finding

much less probability that racial bias had affected it."  941 F.2d at 1482.  Nine judges of the Ninth

Circuit echoed the same sentiment, finding under *Strickland* that a "reasonable probability" of

success of the petitioner's *Batson* challenge, had one been raised, "is sufficient to undermine

Case No. 97-CV-03825-LHK
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
INEFFECTIVE ASSISTANCE OF COUNSEL

1   confidence in the outcome of the trial *because* a *Batson* violation is structural error." *Williams*, 396

2   F.3d at 1072 (emphasis added).  Indeed, "[w]hen constitutional error calls into question the

3   objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither

4   indulge a presumption of regularity nor evaluate the resulting harm." *Vasquez v. Hillery*, 474 U.S.

5   254, 263 (1986).  Such discrimination "undermines the structural integrity of the criminal tribunal

6   itself." *Id.* at 263-64.

7                                          **e. Prejudice Conclusion**

8        In sum, under the framework established in *Carrera*, Petitioner has had to show a

9   "reasonable probability" that, at trial, he would have succeeded under *Wheeler* in showing a strong

10  likelihood that the African Americans in Petitioner's venire were challenged because of their group

11  association and that the prosecutor would have been unable to justify at least one of those challenges

12  on a nondiscriminatory basis.  *Carrera*, 699 F.3d at 1108.  Reviewing Petitioner's subclaim de novo,

13  because the Court owes no deference under § 2254(d), the Court finds that Petitioner has met his

14  burden.[12]

15                                              **CONCLUSION**

16       For the foregoing reasons, the Court hereby ORDERS as follows:

17       (1) The petition for writ of habeas corpus is GRANTED as to claim D's subclaim of

18  ineffective assistance of counsel, and Petitioner's judgment of conviction and sentence of

19  death are accordingly vacated.

20       (2) All of Petitioner's remaining claims are dismissed as moot.

21       (3) Within 120 days of this Order, Respondent shall release Petitioner from custody, or grant

22  him a new trial in accordance with California law and the U.S. Constitution.

23

24

---

25       [12] As Petitioner has established that counsel was ineffective at trial, the Court need not reach
    the issue of whether a *Wheeler* objection would have been successful on direct appeal.  *See Carrera*,
26  699 F.3d at 1108-09 (addressing prejudice on appeal only after analyzing prejudice at trial).

27                                                   42

28  Case No. 97-CV-03825-LHK
    ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
    INEFFECTIVE ASSISTANCE OF COUNSEL

1    **IT IS SO ORDERED.**

2

3    DATED: May 1, 2015

     _____
     LUCY H. KOH
4    United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                           43

28   Case No. 97-CV-03825-LHK
     ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AS TO CLAIM D'S SUBCLAIM OF
     INEFFECTIVE ASSISTANCE OF COUNSEL